**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

UNITED STATES OF AMERICA

v.

SAMUEL HERNANDEZ-MONTEALEGRE,          Criminal No. 3:06CR9

RONALDO ESTUARDO PANIAGUA-MARTINEZ,    Criminal No. 3:06CR12

                Defendants.


**MEMORANDUM OPINION**

On August 17, 2006, in separate cases, the Court sentenced Samuel Hernandez-Montealegre ("Hernandez-Montealegre") and Ronaldo Estuardo Paniagua-Martinez ("Paniagua-Martinez"). In both sentencings, the Defendants moved for two-level departures under U.S.S.G. § 5K2.0 based on their consent to deportation and waiver of rights with respect to deportation. The Defendants also moved for non-guideline sentences based on the potential sentencing disparities caused by early disposition, or "fast-track," programs in other districts, which was opposed by the United States.[1] For the reasons set forth on the record at sentencing, and elaborated upon below, the motions for downward departure and the motions for non-guideline sentences are denied.

_____

[1] The briefing ordered by the Court (Docket No. 33) also included the case of Osbin Hernandez-Regalado, 3:05CR532 (E.D. Va.), but Hernandez-Regalado was sentenced on May 19, 2006 because the parties agreed to withdraw their motions and objections in light of the fact that Hernandez-Regalado had already served the high-end of the guideline sentence.

## STATEMENT OF FACTS

On February 24, 2006, Hernandez-Montealegre pled guilty to a single count criminal information, which charged him with production of fraudulent identification documents, in violation of 18 U.S.C. § 1028(a)(1).  The plea agreement provided that, in return for Hernandez-Montealegre's consent to removal and waiver of his rights with respect to deportation, the United States would recommend a two-level reduction in Hernandez-Montealegre's offense level.  Consequently, the United States has "consented" to a two-level downward departure based on Hernandez-Montealegre's consent to deportation and waiver of rights with respect to deportation, citing a 1995 memorandum issued by the Attorney General of the United States (the "Attorney General's Memorandum").  Hernandez-Montealegre moved for the downward departure, but alternatively moved for a variance based on potential sentencing disparities resulting from fast-track programs in other districts.  The United States opposed a variance based on potential sentencing disparities.

On January 19, 2006, Paniagua-Martinez pled guilty to a two count indictment.  Count One charged Paniagua-Martinez with production of fraudulent identification documents, in violation of 18 U.S.C. § 1028(a)(1).  Count Two charged Paniagua-Martinez with production of counterfeit alien registration cards, in violation of 8 U.S.C. § 1306(d).   In the plea agreement, Paniagua-Martinez

consented to deportation and waived his rights with respect to deportation.  The United States did not agree to recommend a two-level departure as it did in the case of Hernandez-Montealegre, but did not oppose a two-level departure based on Paniagua-Martinez' consent to deportation and waiver of rights, citing the Attorney General's memorandum.  Just as in the case of Hernandez-Montealegre, Paniagua-Martinez alternatively moved for a variance based on potential sentencing disparities resulting from fast-track programs in other districts, which the United States opposed.

With respect to consent to removal, the Defendants' plea agreements both stated:

> The defendant acknowledges that the defendant is removable from the United States and agrees not to contest any removal proceedings brought against the defendant by the Department of Homeland Security (DHS).  If the DHS files a Notice to Appear or other administrative charging document against the defendant, the defendant agrees to request an expedited removal hearing and to consent to removal. The defendant acknowledges that by consenting to removal, the defendant will be immediately removed from the United States upon the completion of any period of incarceration. The defendant knowingly waives any and all rights to appeal, reopen, reconsider, or otherwise challenge this removal.

Hernandez-Montealegre Plea Agreement ¶ 14; Paniagua-Martinez Plea Agreement ¶ 18.  The Defendants' plea agreements also waived rights related to removal from the United States:

> The defendant agrees to waive the defendant's rights to any and all forms of relief from removal, deportation, or exclusion under the

Immigration and Nationality Act (as amended)
and related federal regulations.  These rights
include, but are not limited to, the ability
to apply for the following forms of relief:
(a) voluntary departure; (b) asylum; (c)
cancellation of removal; (d) withholding of
suspension of deportation; and (e) adjustment
of status.  In addition, the defendant agrees
to waive the defendant's rights to relief from
removal under Article 3 of the Convention
Against Torture.

Hernandez-Montealegre Plea Agreement ¶ 15; Paniagua-Martinez Plea

Agreement ¶ 19.  The plea agreements also stated that the

Defendants understood that any previously filed applications for

relief from removal would be deemed abandoned, and provided that

the Defendants would assist the Department of Homeland Security

("DHS") in effectuating their removal.

## DISCUSSION

## I.   Motion for Downward Departure Under U.S.S.G. § 5K2.0

The Defendants moved for a two-level downward departure under

U.S.S.G. § 5K2.0 on the basis of their consent to removal and

waiver of rights with respect to deportation.

### A.   Whether Guideline Sentence Serves Factors in § 3553(a)

Following United States v. Booker, 543 U.S. 220 (2005), the

Fourth Circuit has set forth a multi-step procedure for district

courts to follow at sentencing.  See United States v. Moreland, 437

F.3d 424, 432 (4th Cir. 2006).  First, the sentencing "court must

correctly determine, after making appropriate findings of fact, the

applicable guideline range."  Id.  Second, the court must determine

4

whether a sentence within that range serves the factors set forth in § 3553(a)." Id. (quoting United States v. Green, 436 F.3d 449, 456 (4th Cir. 2006)).  Third, if a sentence within the guideline range does not serve the factors set forth in § 3553(a), then the court should "select a sentence within statutory limits that does serve those factors." Id. (quoting Green).  With respect to this step, the Fourth Circuit has specified that district courts

> should first look to whether a departure is appropriate based on the Guidelines Manual or relevant case law. . .  If an appropriate basis for departure exists, the district court may depart.  If the resulting departure range still does not serve the factors set forth in § 3553(a), the court may then elect to impose a non-guideline sentence (a "variance sentence").

Id.  And fourth, the sentencing court "must articulate the reasons for the sentence imposed, particularly explaining any departure or variance from the guideline range.  The explanation of a variance sentence must be tied to the factors set forth in § 3553(a) and must be accompanied by findings of fact as necessary." Id. (omitting internal citation).  However, courts "need not discuss each factor set forth in § 3553(a) 'in checklist fashion.'" Id. Rather, "it is enough to calculate the range accurately and explain why (if the sentence lies outside it) a particular defendant deserves more or less." Id. (quoting United States v. Dean, 414 F.3d 725, 729 (7th Cir. 2005)).

5

There is no dispute in this case as to the accuracy of the presentence investigation reports, and the parties agree that the Probation Officer has correctly calculated the applicable guideline ranges.[2]   Thus, the Court must first consider whether sentences within the applicable guideline ranges serve the factors set forth in § 3553(a).   Among other § 3553(a) factors, the Court must consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford adequate deterrence to criminal conduct, (C) to protect the public from further crimes of the defendant, and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.   See 18 U.S.C. § 3553(a); Moreland, 437 F.3d at 432.

Neither the Defendants nor the United States have articulated an argument as to why sentences within the applicable guideline ranges would not serve the factors set forth in § 3553(a), and none

---

[2] Hernandez-Montealegre has a total offense level of 14 and a category I criminal history, giving him a sentencing range of 15 to 21 months imprisonment.   Paniagua-Martinez has a total offense level of 17 and a category I criminal history, giving him a sentencing range of 24 to 30 months imprisonment.

are apparent from the record.  While the Defendants would seem to pose little danger to the public, given their minimal criminal histories and consent to removal, the applicable sentencing ranges are well suited to affording the necessary deterrence for such crimes.  Light sentences followed by deportation are unlikely to deter the fraudulent production of identification documents for illegal aliens.  There is no suggestion that sentences within the applicable guideline ranges fail to reflect the seriousness of the offenses, to promote respect for the law, or to provide just punishment.  And, as set forth in greater detail below, the sentencing disparities caused by early disposition programs authorized in other districts have been sanctioned by Congress; not to mention the fact that the crimes at issue in these cases are not even the subject of fast-track programs.  Thus, the Court finds that sentences within the applicable guideline ranges serve the factors set forth in § 3553(a).

That being the case, it is not necessary to consider the merits of the motion for downward departure.  Nevertheless, the Court deems it prudent to do so in the event that the Court is mistaken as to its previous finding.

### B.    Post-<u>Booker</u> Departures and Viability of <u>Rybicki</u>

When the Court ordered the parties to brief the motion for downward departure, it instructed the parties to frame their departure analyses as directed by the Fourth Circuit in <u>United</u>

States v. Rybicki, 96 F.3d 754 (4th Cir. 1996).  Despite moving for a downward departure, the Defendants question whether departures from the Sentencing Guidelines are a relevant consideration following the decision in Booker, 543 U.S. 220, where the Supreme Court excised 18 U.S.C. § 3553(b)(1) from the Sentencing Reform Act of 1984 in order to remedy the Sixth Amendment violation created by the mandatory nature of the guidelines.  Given the excision of the statutory language providing for departures in § 3553(b)(1), and the advisory nature of the guidelines, the Defendants suggest that departures are no longer an integral part of sentencing, and thus that Rybicki does not provide the controlling analysis.

Essentially, the Defendants contend that departures have been replaced in toto by variances.  While the "circuits are divided in regard to whether [] Guidelines-based departures may still be granted or have become obsolete," United States v. Sanchez-Juarez, 446 F.3d 1109, 1113 (10th Cir. 2006)(collecting cases), the Fourth Circuit has unequivocally sided with the position that "so-called 'traditional departures' -- i.e., those made pursuant to specific guideline provisions or case law -- remain an important part of sentencing even after Booker." Moreland, 437 F.3d at 433.  "A district court may grant a 'traditional' downward or upward departure if it finds an aggravating or mitigating factor of a kind or a degree that the Sentencing Commission did not consider applicable to the 'heartland' of cases." United States v. Hampton,

441 F.3d 284, 287 n.1 (4th Cir. 2006)(citing   <u>Koon v. United States</u>, 518 U.S. 81, 92-94 (1996)).

While there can be no doubt that "traditional" departures remain an important element of sentencing under Fourth Circuit law, the Fourth Circuit has yet to reaffirm the framework set forth in <u>Rybicki</u> in its post-<u>Booker</u> opinions.  However, thus far, there is no reason to believe that the applicable departure analysis has been altered by the excision of § 3553(b)(1) from the Sentencing Reform Act.  The treatment of departures under the Sentencing Guidelines continues to echo the excised departure language in § 3553(b)(1).  <u>See</u> U.S.S.G. § 5K2.0.  Moreover, the general application principles continue to state that the Sentencing Commission "intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes."  U.S.S.G. § 1A1.1, cmt. n.1.[3]  <u>See</u> <u>Koon</u>, 518 U.S. at 93-95.  Thus, "[w]hen a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted."  U.S.S.G. § 1A1.1, cmt. n.1.  The language in the Sentencing Guidelines, on

---

[3] Originally, Part A of Chapter One of the Sentencing Guidelines was an introduction to the Guidelines Manual, which the Sentencing Commission amended from time to time.  Since 2003, the introduction has been included in the Guidelines Manual as an editorial note following § 1A1.1.  The Sentencing Commission's discussion of departures can be found in comment 4(b) of the introduction.

which the Fourth Circuit framed its departure analysis in Rybicki, has not been altered by Booker.  Thus, Rybicki continues to control departure analyses, and it will be applied here.

**C.   Rybicki Analysis**

In Rybicki, the Fourth Circuit took the reins from the Supreme Court in Koon, and prescribed the following analysis for sentencing courts to follow when deciding whether to depart from the applicable guideline:

> 1. The district court must first determine the circumstances and consequences of the offense of conviction. . .
> 2.  The district court must then decide whether any of the circumstances or consequences of the offense of conviction appear 'atypical,' such that they potentially take the case out of the applicable guideline's heartland. . .
> 3.  Having identified factors that may potentially remove a case from the applicable guideline's heartland, the district court must identify each according to the Guidelines' classifications as a 'forbidden,' 'encouraged,' 'discouraged,' or 'unmentioned' basis for departure. . .
> 4.  Factors that are 'encouraged,' 'discouraged,' or 'unmentioned' require further analysis.  'Encouraged' factors are usually appropriate bases for departure. Conversely, 'discouraged' factors are not ordinarily relevant, but may be relied upon as bases for departure in exceptional cases, e.g., where the factor is present to an exceptional degree or in some other way that makes the case different from the ordinary case where the factor is present. . . Finally, although the Sentencing Commission expects departures based on 'unmentioned' factors to be highly infrequent, such factors may justify a departure where the structure and theory of both relevant individual

> guidelines and the Guidelines taken as a whole
> indicate that they take a case out of the
> applicable guideline's heartland. . .
> 5. As the last step, the district court must
> consider whether circumstances and
> consequences appropriately classified and
> considered take the case out of the applicable
> guideline's heartland and whether a departure
> from the guideline's specified sentencing
> range is therefore warranted.

Rybicki, 96 F.3d at 757-758 (omitting internal citations and quotation marks).

### 1.   Circumstances and Consequences of Conviction

The Defendants' motions for downward departure rely on the fact that, in the Defendants' plea agreements, they consented to removal from the United States and waived their rights with respect to deportation proceedings, and thus the Court must consider the circumstances and consequences of these waivers.

Mr. Hernandez-Montealegre is a twenty-one year old native of Mexico, who entered the United States illegally in 2002 by way of Nogales, Arizona. He reports that he came to the United States to make a better life for himself and his family. Hernandez-Montealegre first settled in Fresno, California, and then moved to Richmond, Virginia in mid-2004. He has no criminal history. Hernandez-Montealegre has two daughters, both of whom are United States citizens.

With respect to the offense of conviction, Hernandez-Montealegre was arrested in December 2005 after he attempted to sell a counterfeit Resident Alien Card to a confidential informant

11

working with the Bureau of Immigration and Customs Enforcement (BICE) at DHS.  Based on information provided by the confidential informant, police executed a search warrant at Hernandez-Montealegre's residence, where they found a Dell computer, typewriter, two scanners, several cameras, a laminating machine, numerous blank Social Security Cards, and numerous blank Resident Alien Cards.  For relevant conduct purposes, 33 fraudulent identification documents have been attributed to Hernandez-Montealegre.

Mr. Paniagua-Martinez is a thirty-nine year old native of Guatemala, who entered the United States illegally in 2003.  Once in the United States, Paniagua-Martinez moved to Richmond, Virginia.  Paniagua-Martinez reports that he came to the United States so that he could earn more money to support his wife and four children, who live in Guatemala City.  The only criminal history for Paniagua-Martinez is a single citation for driving without a license, for which he received no criminal history points.

With respect to the offenses of conviction, the facts are similar to those of Hernandez-Montealegre.  In March 2005, a confidential informant provided information to law enforcement, indicating that Paniagua-Martinez was manufacturing and selling counterfeit United States identification documents out of his residence.  Ultimately, the confidential informant made a

controlled purchase of a counterfeit Mexican driver's license from Paniagua-Martinez, at the direction of the United States Secret Service. After the Secret Service received an anonymous tip in late March 2005 that Paniagua-Martinez was manufacturing and selling a large volume of counterfeit identification documents, a second confidential informant made a controlled purchase of a counterfeit Resident Alien Card and a counterfeit Social Security Card, at the direction of the Secret Service. After further information as to Paniagua-Martinez' activities was developed by the United States Postal Inspection Service, a federal search warrant was obtained and executed at Paniagua-Martinez' residence. Law enforcement agents recovered more than 200 fraudulent identification documents (e.g., Social Security Cards, Resident Alien Cards, Mexican driver's licenses, international driver's licenses), a personal computer, a printer, a digital camera, and laminating equipment.

Of course, the most relevant circumstance with respect to these Defendants as to the motions at issue is that they have both consented to removal and have waived their rights with respect to deportation proceedings. At the end of the Defendants' terms of imprisonment, they will be deported to their home countries by DHS. However, it is possible that the Defendants will spend a period of time in further confinement until arrangements are made to transport them to their respective countries.

13

## 2.   **Whether Circumstances of Conviction Were Atypical[4]**

There is nothing atypical about the circumstances or consequences of the Defendants' convictions.  Most illegal aliens come to the United States in the hope of being able to provide greater financial support for their loved ones, and many have children while in the United States, who become United States citizens.  And indeed, many criminal defendants who are also illegal aliens consent to removal and waive deportation proceedings in order to expedite the criminal process and in hopes of receiving leniency both from the United States and the federal courts.

### 3.   **Unmentioned Basis for Departure**

The Attorney General's Memorandum was circulated on April 28, 1995, to all federal prosecutors, urging them to assist in the expeditious deportation of criminal aliens through the use of available prosecutorial tools.  <u>See</u> Defendants' Opening Brief, Attachment 1 (Memorandum on Deportation of Criminal Aliens). Specifically, the Attorney General made reference to stipulated administrative deportations, which are predicated on an alien's admissions of alienage and deportability.  In order to obtain stipulated administrative deportation orders, the Attorney General

---

[4] "This determination will necessarily be informed by the district court's experience in criminal sentencing.  Unlike the other steps in this analysis, a district court's identification of factors for potential consideration is purely analytical and, therefore, is never subject to appellate review."  <u>Rybicki</u>, 96 F.3d at 757.

14

authorized federal prosecutors "to recommend a one or two level downward departure from the applicable guideline sentencing range in return for the alien's concession of deportability and agreement to accept a final order of deportation." Id. The Attorney General posited that "[s]uch downward departure is justified on the basis that it is conduct not contemplated by the guidelines."[5]  Id. (citing U.S.S.G. § 5K2.0).

"A departure may be warranted in the exceptional case in which there is present a circumstance that the [Sentencing] Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." U.S.S.G. § 5K2.0(a)(2)(B). "However, inasmuch as the Commission has continued to monitor and refine the guidelines since their inception to take into consideration relevant circumstances in sentencing, it is expected that departures based on such unidentified circumstances

---

[5] The Attorney General's memorandum includes a number of prerequisites that must be satisfied before federal prosecutors can agree to recommend a downward departure based on a defendant's consent to deportation and waiver of rights pursuant to a plea agreement. Before engaging in any plea negotiations, the Attorney General has instructed prosecutors to notify the designated Bureau of Immigration and Customs Enforcement ("BICE," formerly Immigration and Naturalization Services) contact, who must concur before any plea agreement is entered. Additionally, the Attorney General stated that the plea agreement must contain the alien defendant's acceptance of an administrative order of deportation at or prior to sentencing. These prerequisites do not appear to have been met in this case. However, it is not the Court's role to enforce the internal policies and procedures of the Department of Justice, and the United States' apparent failure to abide by the Attorney General's terms has no bearing on the merit of the motion for downward departure.

will occur rarely and only in exceptional cases." U.S.S.G. §
5K2.0, cmt. n.3(A)(2). In this case, the unmentioned factor is an
alien defendant's consent to removal and waiver of rights with
respect to deportation. After the Attorney General's Memorandum
was issued, a number of circuits addressed the question whether a
defendant's stipulation to deportation warrants a downward
departure under § 5K2.0.

In United States v. Clase-Espinal, 115 F.3d 1054, 1056 (1st
Cir. 1997), the United States Attorney for the District of
Massachusetts recommended a two-level departure under § 5K2.0
"based on the agreement by the defendant to stipulate to
deportation and waive any related appeal." The district court
denied the motion for downward departure, finding that

> a downward departure on the basis of the
> concession of deportability and an agreement
> not to contest it is not a matter that was
> left unconsidered by the Sentencing
> Commission. Certainly, the specific factual
> circumstances were not considered by the
> Sentencing Commission, but the larger issue of
> deportation and the mechanisms for
> deportation, agreements to ameliorate the
> difficulties that are administrative burdens
> for the government, are matters within the
> scope of the 'heartland' calculations of the
> Sentencing Commission, generally, and in
> connection with deportation.

Id. The district court rejected the motion as matter of law, and
commented that the Attorney General's Memorandum was tantamount to
a "shadow sentencing guideline, unauthorized by relevant law." Id.
On appeal, the First Circuit noted that the question presented

16

turned "upon an abstract legal principle: whether the stipulation and waiver relating to alienage and deportability permit a section 5K2.0 departure based on the conclusory departure rationale propounded in the Memorandum." Id. at 1057.

The First Circuit agreed with the parties that "the proffered departure ground is not expressly forbidden, discouraged, or encouraged by the Sentencing Guidelines," but also agreed with the district court that the proffered ground "is insufficient, as a matter of law, to warrant a downward departure." Id. The court noted that it was "loath to presume, as a general matter, that the Commission either overlooked or inadequately considered the statutory and regulatory structures upon which an informed sentencing treatment of immigration offenses significantly depended." Id. (defendant was charged with unlawful reentry after deportation under 8 U.S.C. § 1326(a)). Moreover, the First Circuit believed it "quite clear that the Commission would have considered that an alien defendant. . . almost certainly would be deported []." Id.

Even where the Sentencing Commission has adequately taken a circumstance into consideration when determining a guideline, there may be exceptional cases where the circumstance is present to a degree not adequately considered by the Commission. In such a case, a departure may be warranted "if the court determines that such circumstance is present in the offense to a degree

17

substantially in excess of, or substantially below, that which ordinarily is involved in that kind of offense." See U.S.S.G. § 5K2.0(a)(3). However, "no substantial atypicality is demonstrated where an alien defendant simply stipulates to deportation and <u>no nonfrivolous defense to deportation is discernible</u>." <u>Clase-Espinal</u>, 115 F.3d at 1059 (emphasis added).

In <u>Clase-Espinal</u>, the First Circuit noted that

> the government's conclusory departure recommendation, <u>simpliciter</u>, does not purport to demonstrate that the facilitative conduct relied upon even constituted substantial assistance warranting sentencing leniency. Consequently, there is no indication that any administrative convenience to the government constituted a mitigating circumstance 'to a degree' not adequately considered by the Commission. More to the [] point, the stipulation in this case must be considered <u>de minimis</u> from the standpoint of its assistance in alleviating any administrative burden upon the government, since Clase has no discernible defense to deportation.
>
> Thus, the parties essentially are left with their implicit contention that any stipulated deportation constitutes an extraordinary mitigating circumstance, for no other reason than that it bears the government's endorsement and dispenses with an administrative hearing. However, were downward departures permitted simply on the conclusory representations in the Memorandum, without regard to whether the alien defendant has a nonfrivolous defense to deportation, individualized guideline sentencing indeed could be undermined by what the district court aptly termed a 'shadow guideline' that would erode the prescribed [base offense level] in any alien-criminal defendant's case to which the government chose to apply the Memorandum, <u>simpliciter</u>.

Id. at 1059-1060 (omitting internal citations).  The court held that "[t]he district court correctly determined that it lacked authority to depart on the ground that the stipulated deportation constituted mitigation to a degree neither readily envisioned nor often seen in connection with such an offender or offense of conviction."  Id. at 1060.

A majority of the circuits that have addressed motions for downward departure based on consent to removal have noted their agreement with the First Circuit's reasoning in Clase-Espinal.  See United States v. Galvez-Falconi, 174 F.3d 255, 260 (2nd Cir. 1999) ("[A] defendant seeking a departure under § 5K2.0 for consenting to deportation must present a colorable, nonfrivolous defense to deportation, such that the act of consenting to deportation carries with it unusual assistance to the administration of justice."); United States v. Marin-Castaneda, 134 F.3d 551, 555-556 (3rd Cir. 1998)("[A] defendant without a nonfrivolous defense to deportation presents no basis for downward departure under section 5K2.0 by simply consenting to deportation...."); United States v. Mignott, 184 F.3d 1288, 1291 (11th Cir. 1999)(agreeing with Clase-Espinal and holding that "a defendant's consent to a deportation against which he has no apparent defense would be a meaningless concession that fails to remove him from the heartland of other alien criminal defendants facing deportation.").  The only authority to the contrary is the Eighth Circuit's decision in United States v. Cruz-

Ochoa, 85 F.3d 325, 325-326 (8th Cir. 1996), in which it held, without explanation, that the district court had erred in holding that it could not downwardly depart "on the basis of defendant's waiver and consent to administrative deportation upon the filing of a joint motion by the parties for a two-level downward departure at sentencing on defendant's plea of guilty to illegal re-entry." But see United States v. Rodriguez-Lopez, 198 F.3d 773, 777 n.4 (9th Cir. 1999).

The Fourth Circuit has yet to address the question whether a defendant's consent to removal and waiver of rights with respect to deportation is a circumstance not adequately considered by the Sentencing Commission, or not adequately considered to the degree present.   The Court finds the reasoning in Clase-Espinal and its progeny persuasive, and adopts it here.[6]   While most of the cases cited above involved convictions for illegal reentry after deportation, see 8 U.S.C. § 1326, the fact that this case involves convictions for counterfeit identification documents does not alter the departure analysis.   See United States v. Sentamu,[7] 212 F.3d

---

[6] The Defendants attempt to distinguish some of Clase-Espinal's progeny on the ground that they involved defendants' unilateral motions for downward departure.   However only the Third Circuit, in Marin-Castaneda, held that the government's failure to join a motion for downward departure was a relevant consideration.

[7]The United States has cited Sentamu in support of the proposition that consent to deportation provides substantial assistance to the government by reducing the time and resources spent on deportation proceedings.   However, the United States' references are to the district court's opinion, which was quoted

127, 136 (2nd Cir. 2000); Mignott, 184 F.3d at 1291 ("It seems unlikely that, in fashioning the guidelines for drug importation, the Commission did not consider that some defendants would be aliens who might stipulate to deportation."). There is no reason to believe that the Sentencing Commission failed adequately to consider circumstances involving the deportation of alien defendants, especially where the offense of conviction is related to aiding aliens in remaining illegally in the United States.

The United States also argues that consent to deportation is a form of super-acceptance of responsibility, which thereby justifies departure. The notion of super-acceptance of responsibility defies logic. A defendant either accepts responsibility for his crime or he does not. The Fourth Circuit's opinion in United States v. Hairston, 96 F.3d 102, 107 (4th Cir. 1996) does not stand for the proposition that a sentencing court can depart based on extraordinary acceptance of responsibility. Rather, the Fourth Circuit held that even though restitution is considered under the guideline for acceptance of responsibility, see U.S.S.G. § 3E1.1, extraordinary efforts at restitution can form the basis for a departure.

_____

heavily by the Second Circuit as background. Ultimately, the Second Circuit reaffirmed its holding in Galvez-Falconi and vacated the district court's judgment. See Sentamu, 212 F.3d at 137-138 (rejecting district court's attempt to analogize consent to deportation to substantial assistance under U.S.S.G. § 5K1.1).

In U.S.S.G. § 5K2.0(d)(4), the Sentencing Commission stated in a parenthetical that "a departure may not be based merely on the fact that the defendant decided to plead guilty or to enter into a plea agreement, but a departure may be based on justifiable, non-prohibited reasons as part of a sentence that is recommended, or agreed to, in the plea agreement and accepted by the court." The Defendants argue that, because the parties have recommended a departure based on the consent to deportation,[8] and it is not a prohibited basis for departure, the Court should follow the recommendation.  The key language, however, is that the basis for departure must be justifiable and accepted by the Court.  Absent consent to removal despite a nonfrivolous defense to deportation, a defendant's recommended departure cannot be characterized as justifiable.  Indeed, acceptance of such departures would leave the sentencing process prone to "shadow guidelines" and manipulation.[9]

---

[8] In actuality, the United States only agreed to recommend the departure in Hernandez-Montealegre's plea agreement.

[9] The Defendants also argue that the Court should downwardly depart simply because the parties have agreed to the departure and the Fourth Circuit has taken a strong position on enforcing plea agreements.  The argument is meritless and tiresome in its repetition.  Non-binding sentencing recommendations contained within plea agreements are subject to enforcement only to the extent that the government must recommend the sentence and departures to which it agreed.  The United States has recommended the departure just as it agreed to do, and thus there are no enforcement issues here.  The Court may accept the parties' recommendation or not.  Otherwise, the distinction between plea agreements under Fed. R. Crim. P. 11(c)(1)(B) and 11(c)(1)(C) would be utterly eviscerated.

22

**4. Whether Circumstances of Conviction Warrant Departure**

The Defendants concede that they are "inadmissible" aliens by virtue of the fact that they arrived in the United States without permission and committed crimes of moral turpitude.[10] <u>See</u> 8 U.S.C. § 1182(a)(2)(A)(i)(I) and (a)(6)(A)(I). While the Attorney General may in certain circumstances waive the inadmissibility of an alien who has committed a crime of moral turpitude, there is no waiver provision where inadmissibility is based on the alien's illegal entry into the United States. <u>See</u> 8 U.S.C. § 1182(h). Moreover, the Defendants would not be eligible under § 1182(h) because they were not in the United States lawfully, nor were they in the United States for at least 7 years.

An alien who has not been admitted to the United States is "removable" unless he can prove "clearly and beyond doubt" that he is "entitled to be admitted and is not inadmissible under" § 1182. 8 U.S.C. § 1229a(c)(2)(A). <u>See also</u> 8 U.S.C. § 1229a(e)(2)(A). The Defendants already have conceded that they cannot meet their

_____

[10] While there is no precise definition of a crime of moral turpitude, crimes of fraud are generally considered to be crimes of moral turpitude. In this case the Defendants produced fraudulent identification documents, and were convicted under 18 U.S.C. § 1028(a)(1). This is a crime of fraud, and thus a crime of moral turpitude. <u>See</u> <u>Babafumni v. United States</u>, 210 F.3d 360, *1 (4th Cir. 2000)(unpublished)(holding that Board of Immigration Appeals reasonably concluded that a conviction for possessing document making implements under 18 U.S.C. § 1028(a)(5) is a crime of fraud and therefore a crime of moral turpitude). <u>See also</u> <u>Jordan v. De George</u>, 341 U.S. 223 (1951).

burden of proof and that they are therefore inadmissible.  Thus, the Defendants are removable from the United States.

Under certain conditions, the Attorney General has authority to cancel the removal of inadmissible aliens:

> The Attorney General may cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States if the alien--
>
>> (A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application;
>>
>> (B) has been a person of good moral character during such period;
>>
>> (C) has not been convicted of an offense under section 1182(a)(2), 1227(a)(2), or 1227(a)(3) of this title, subject to paragraph (5); and
>>
>> (D) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.[11]

8 U.S.C. 1229b(b)(1).  In this case, however, the Defendants have not been continuously physically present in the United States for a period of 10 years and they have committed crimes of moral turpitude under § 1182(a)(2).  Thus, they are not eligible for

---

[11] There is another provision for cancellation of removal for inadmissible aliens that were previously lawfully admitted for permanent residence.  It is inapplicable here, as the Defendants were never lawfully admitted for permanent residence.  See 8 U.S.C. § 1229b(a).

cancellation of removal.  Given that the Defendants have conceded inadmissibility, that they are not eligible for waiver of admissibility, and that they are not eligible for cancellation of removal, it is apparent that the Defendants have no nonfrivolous defense to removal.

The Defendants have argued that they have a nonfrivolous defense because they are deemed an applicant for admission under 8 U.S.C. § 1225(a)(1) and there is no _per se_ bar to their admission. The Defendant's argument that there is no _per se_ bar to a finding of admissibility is based on the erroneous view that their inadmissibility may be waived.  The Defendants are not eligible for waiver for the crimes of moral turpitude and there is no waiver provision for illegal entry.  Furthermore, the notion that the absence of a _per se_ bar to admission amounts to a nonfrivolous defense to removal is untenable.

The Defendants cannot mount a nonfrivolous defense to removal from the United States.  Thus, the Defendants' consent to removal and waiver of rights with respect to deportation does not take this case outside the heartland of cases envisioned by the Sentencing Commission, and downward departures are not appropriate.

## II.  Motion for Non-Guideline Sentence Based on Sentencing Disparities

The Defendants also have moved for non-guideline sentences, or variances, on the ground that they are subject to unwarranted

sentencing disparities created by early disposition programs (also known as "fast-track" programs) authorized in certain districts, but which are not authorized in the Eastern District of Virginia.

Fast-track programs began informally in districts along the Mexican border, where district courts were increasingly overwhelmed by high caseloads related to immigration violations.  To alleviate this burden, federal prosecutors engaged in charge-bargaining and agreed to move for downward departures in return for expedited guilty pleas.  Congress formally sanctioned such early disposition programs in the Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub.L. No. 108-21, § 401(m)(2)(B), 117 Stat. 650, 675 (2003), in which it authorized the Attorney General to create and implement programs to aid jurisdictions overwhelmed by high caseloads related to a particular offense or category of offenses.  Congress also directed the Sentencing Commission to promulgate a policy statement authorizing a departure of not more than four levels in cases where the United States moved for a downward departure pursuant to an early disposition program.  The Commission complied in U.S.S.G. § 5K3.1.  See United States v. Perez-Pena, 453 F.3d 236, 238 (4th Cir. 2006).

On September 22, 2003, the Attorney General issued a memorandum to United States Attorneys, which outlined the circumstances under which early disposition programs would be

authorized.    The  Attorney  General  instructed  that  fast-track
programs  would  be  "reserved  for  exceptional  circumstances,  such  as
where  the  resources  of  a  district  would  otherwise  be  significantly
strained  by  the  large  volume  of  a  particular  category  of  cases."
See  Defendants'  Opening  Brief,  Attachment  2  (Memorandum  on
Department  Principles  for  Implementing  an  Expedited  Disposition  or
"Fast-Track"  Prosecution  Program  in  a  District).    "Acting  pursuant
to  authority  delegated  by  the  Attorney  General,  the  Deputy  Attorney
General  approved  fast-track  programs  in  13  districts  for  illegal
reentry  offenses  under  8  U.S.C.A.  § 1326."  Perez-Pena,  453  F.3d  at
239.    However,  no  such  early  disposition  program  has  been
authorized  in  the  Eastern  District  of  Virginia.

The  Defendants  argue  that  they  are  subject  to  unwarranted
sentencing  disparities  because  similarly  situated  defendants  in
districts  with  authorized  fast-track  programs  receive  downward
departures  pursuant  to  § 5K3.1  when  they  agree  to  an  expedited
guilty  plea.    The  most  obvious  problem  with  this  argument  is  that
the  Defendants  did  not  plead  guilty  to  illegal  reentry  under  8
U.S.C.  § 1326.    There  are  no  early  disposition  programs  for
violations  of  18  U.S.C.  § 1028(a)(1).    Thus,  there  are  no  similarly
situated  defendants  receiving  downward  departures  pursuant  to  §
5K3.1  for  agreeing  to  an  expedited  guilty  plea  to  a  charge  of
producing  fraudulent  identification  documents.    The  Defendants  can

point to no sentencing disparities based on fast-track programs in other districts, much less unwarranted sentencing disparities.

However, even if there were early disposition programs for § 1028(a)(1) offenses in other districts, the sentencing disparities would not be unwarranted.  In Perez-Pena,[12] the Fourth Circuit held that the sentencing disparities created by early disposition programs were sanctioned by Congress in the PROTECT Act because "Congress necessarily intended that defendants who did not benefit from such motions -- whether because the Attorney General had not authorized a program in that district or because the Government determined that the program was not appropriate for a particular defendant -- would receive higher sentences than those who did benefit."  Perez-Pena, 453 F.3d at 243.  The Court of Appeals noted that:

> While it is true that Congress and the Commission may not have intended such disparities for their own sake, they surely recognized that such disparities were necessary to achieve the twin goals of obtaining more prosecutions and limiting downward departures to jurisdictions and defendants selected by the Government.  If defendants in fast-track districts expected to receive similar sentences regardless of whether they participated in a program, defendants would have little incentive to participate.  And, if defendants in non-fast-track districts were sentenced as if they had participated in fast-track programs, then the Government would be effectively

---

[12] The Court continued the Defendants' sentences for a brief period while awaiting the Fourth Circuit's decision in Perez-Pena.

> deprived of its discretion to decide which
> districts would have fast-track programs and
> which defendants within those jurisdictions
> should be allowed to participate.   These
> results would amount to a rejection of
> Congress' and the Sentencing Commission's
> policy choices.

Id. at 244.   The Fourth Circuit concluded that sentencing disparities created by early disposition programs are not unwarranted for purposes of 18 U.S.C. § 3553(a)(6), and that variances on that ground would run afoul of Congress' directive and prosecutorial discretion.   Accord United States v. Sebastian, 436 F.3d 913, 916 (8th Cir. 2006); United States v. Martinez-Martinez, 442 F.3d 539, 542 (7th Cir. 2006); United States v. Jiminez-Beltre, 440 F.3d 514, 519 (1st Cir. 2006).

The Fourth Circuit also criticized, as overly simplistic, the argument that such sentencing disparities are unwarranted because they are "based only on the jurisdiction in which the defendants were arrested." Perez-Pena, 453 F.3d at 242.   The Court noted that

> The fortuity of whether a defendant is offered
> a fast-track plea bargain is not different in
> any relevant way from the fortuity of whether
> a defendant possesses information that he can
> offer the Government in return for a reduced
> sentence.   Defendants who are fortunate enough
> to be able to offer the Government what it
> wants can obtain reduced sentences not because
> they deserve the reductions, but because the
> reductions are the leverage that allows the
> Government to get what it wants.

Id. Defendants are not penalized by virtue of being arrested in a district without an early disposition program.   Rather, they are

29

simply unable to confer a benefit on the government by virtue of their agreement to an expedited guilty plea, and thus receive no reward.  See id. at 243.  To sentence defendants as if they had conferred such a benefit "would effectively nullify the Government's discretion to determine which defendants it wishes to receive the benefit of a" motion for downward departure.  Id. (noting that reasoning justifying charge-bargaining programs applies equally to motions for downward departure).  And, indeed, "allowing sentencing courts to determine whether they should sentence non-fast-track defendants as if they had been fast-tracked would produce 'unwarranted sentence disparities' between similarly situated non-fast-track defendants, some of whom would benefit from the existence of others' fast-track deals and some of whom would not."  Id. n.3.  See also United States v. Perez-Chavez, 422 F.Supp.2d 1255, 1263-1264 (D. Utah 2005)(holding that variances on such grounds  "create fast-track programs by judicial fiat," and generate "the unseemly spectacle that a defendant's sentence will depend on which courtroom" or which district he happens to find himself).

The Defendants attempt to overcome the obvious import of Perez-Pena by arguing that "[a] careful reading of Perez-Pena leads to the conclusion that an agreed-upon variance based on fast-track principles in which the government acknowledges the reciprocal benefits -- as it has in this case -- reflects a recognition of

'the seriousness of the offense,' promotion of 'respect for the law,' and provides 'just punishment for the offense.'" Defendant's Supplemental Position on Sentencing In Response to Fourth Circuit's Opinion in Perez-Pena, p.4.  However, the United States has not agreed to, and in fact opposes, a variance based on sentencing disparities from early disposition programs, including reliance on other § 3553(a) factors.  Moreover, beyond conclusory statements, the Defendants have articulated no argument that the applicable guideline sentences for these Defendants fail to reflect the seriousness of the offenses and provide just punishment.  The Defendants' only argument with respect to promoting respect for the law is that early disposition programs create "sentencing by lottery, not reason."  Defendants' Reply, p.9.  The Fourth Circuit adequately explained in <u>Perez-Pena</u> why that oversimplification is melodramatic distortion.

For the foregoing reasons, the Court finds that variances based on the sentencing disparities created by fast-track programs in other districts would not be appropriate.

**CONCLUSION**

For the foregoing reasons, the motions for downward departure and the motions for non-guideline sentences are denied.

The Clerk is directed to docket this Memorandum Opinion in both of the above captioned cases and to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.


_____/s/_____
Robert E. Payne
United States District Judge


Richmond, Virginia
Date: August 17, 2006